Brian M. Bergin, (#016375)
**Bergin, Frakes, Smalley & Oberholtzer, PLLC**
4343 E. Camelback Road, Suite 210
Phoenix, Arizona 85018
Telephone: (602) 888-7858
Facsimile: (602) 888-7856
bbergin@bfsolaw.com
*Attorneys for Defendants Faith and Freedom Coalition, Inc and Ralph Reed*

Jason Torchinsky
Stephen Roberts
**Holtzman Vogel Josefiak Torchinsksy**
45 North Hill Drive, #100
Warrenton, Virginia 20186
*Pro Hac Vice Counsel for Defendants FFC & Reed*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Amber Pickett, individually and on behalf of all others similarly situated, | Case No.:CV-19-00014-PHX-DLR |
| Plaintiff, | |
| v. | (Assigned to Hon. Douglas L. Rayes) |
| Faith and Freedom Coalition, Inc.; Ralph Reed; and Americans of Faith, | (Oral Argument Requested) |
| Defendants. | |

**MOTION OF DEFENDANTS', FAITH AND FREEDOM COALITION, INC. AND RALPH REED TO DISMISS THE COMPLAINT WITH PREJUDICE WITH SUPPORTING MEMORANDUM OF LAW**

Defendants Faith and Freedom Coalition, Inc. ("FFC") and Ralph Reed, pursuant to Fed. R. Civ. P. 12(b)(6), hereby move to dismiss the Complaint, with prejudice, and in support thereof files their supporting Memorandum of Law.

## I. INTRODUCTION

Defendants FFC and Ralph Reed hereby move to dismiss the Complaint (DE 1) pursuant to Federal Rule of Civil Procedure 12(b)(6). The Complaint fails to state a claim upon which relief can be granted because the conduct complained of is not regulated by the statute underlying the Plaintiff's claim, 47 U.S.C. § 227 *et seq.*, (the Telephone Consumer Protection Act of 1991, or the "TCPA") and because the TCPA is facially unconstitutional.[1] Specifically, Defendants' alleged conduct is not regulated by the TCPA because the text messages Plaintiff complains of were not initiated by an automatic telephone dialing system ("ATDS") and, regardless of Defendants' alleged conduct, the TCPA violates the First Amendment because the TCPA's ban on telephone calls that either are dialed automatically rather than manually, *id.* § 227(b)(1)(A)(iii) (the "Autodialer Ban"), or that convey a prerecorded message, *id.* § 227(b)(1)(A)(iii), (B) (the "Prerecording Ban") are: overinclusive, underinclusive, and not the least restrictive means by which to further government interests. Under the Overbreadth Doctrine, the unconstitutionality of a portion of the TCPA—even a portion that is not necessarily at issue in the instant case— renders the entire statute invalid and unenforceable.[2]

The Complaint must be dismissed for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), because: (1) the Complaint seeks damages for actions that do not violate the TCPA; and (2) if the TCPA were to apply, it is facially unconstitutional.

## II. RULE 12(b)(6) LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[1] This Motion to Dismiss raises a facial constitutional challenge to the TCPA. If Plaintiff's claims survive this motion, Defendants FFC and Reed will consider challenging the constitutionality of the TCPA as applied in this case after taking discovery.

> "The Court's consideration is limited to the allegations presented. All factual allegations are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. Nevertheless, while a plaintiff need not provide detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555. "While a complaint need not plead detailed factual allegations, the factual allegations it does include must be enough to raise a right to relief above the speculative level." *Ali v. Scotia Grp. Mgmt. LLC*, 2018 U.S. Dist. LEXIS 131612 at *4 (D. Ariz. Aug. 2, 2018) (quoting *Twombly*, 550 U.S. at 545); *see also Neal v. Neal*, 2018 U.S. Dist. LEXIS 42481 at *10 (D. Ariz. Mar. 15, 2018) (dismissing a complaint that "contains few factual allegations and instead is filled mostly with recitations of law and legal conclusions masquerading as facts.").

### III.  FACTUAL ALLEGATIONS

The Complaint alleges that FFC placed, or caused to be placed, text messages to Plaintiff's cellular telephone "in or about" October 2018. Complaint ¶ 16. Plaintiff alleges these text messages began with the sentence "Hi, it's Ralph Reed." *Id*. Plaintiff asserts these text messages were sent via an ATDS because she assumes the system used "is capable of making numerous calls or texts simultaneously (all without human intervention)" *id*. at ¶ 24, and Plaintiff had not provided her express consent to Defendant to be contacted by telephone using an ATDS. *Id*. at ¶ 26. Plaintiff further alleges that these <u>text</u> messages used a "prerecorded voice" as defined by the TCPA because she believes Defendant Reed spoke these messages, which were then transcribed into a text message. *See id.* at ¶¶ 22-23. Plaintiff also alleges these text messages, relating to a voter guide,

"constituted telephone solicitations as defined by 47 U.S.C. § 227(a)(4) and/or advertisements as defined by 47 C.F.R. 64.1200(f)(1)." *Id.* at ¶ 25.[3]

The Complaint alleges such text messages violate the TCPA. *Id.* at ¶¶ 42-51; 47 U.S.C. § 227(b)(1)(A)(iii). The Complaint, demands actual and statutory damages, as well as treble damages pursuant to the TCPA, for the named Plaintiff and others similarly situated. Complaint ¶¶ a.-e.

## IV.   ARGUMENT

### A.   Plaintiff's Complaint Fails To State A Claim Because It Does Not Allege Any Plausible Set Of Facts That Would Show FFC's Communications Were Sent Using An ATDS.

Plaintiff's allegations do not support an inference that FFC's text communication was sent using an ATDS. To survive a motion to dismiss, "a complaint must contain sufficient <u>factual</u> matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). A plaintiff must include in a complaint "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Cook*, 637 F.3d at 1004. The "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 545. Plaintiff has not satisfied her burden here.

The TCPA makes it "unlawful . . . to make any call (other than a call made

---

[3] Unrelated to her claims, Plaintiff also inaccurately states that FFC, as a tax-exempt organization under Section 501(c)(4) of the Internal Revenue Code, is "prohibited from participating in political campaigns in support of certain candidates for public office or in opposition to certain candidates for political office." Complaint ¶ 15. Notwithstanding that publishing a voter guide is not political activity, this statement demonstrates a fundamental misunderstanding of the permissible activities of an organization exempt from tax under Section 501(c)(4). Those organizations are permitted to engage in political activity, so long as it is not that organization's primary activity. *See generally Reg. 1.501(c)(4)-1(a)(2)(ii)*, which provides that the promotion of social welfare does not include direct or indirect participation in political campaigns on behalf of or in opposition to any candidate for public office, meaning that an organization exempt under IRC 501(c)(4) may engage in political campaign activities if those activities are not the organization's primary activity." Internal Revenue Manuals 7.25.4.7 (02-08-1999).

for emergency purposes or made with the prior express consent of the called party) using any *automatic telephone dialing system* . . . to any telephone number assigned to a . . . cellular telephone service . . . for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A) (emphasis added). The Act was Congress's response to an outpouring of concern in the late 1980s and early 1990s over abusive practices by telemarketers, who used certain computerized equipment that would generate numbers to be called at random or in a particular sequence. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370-71 (2012) (noting Congress passed the TCPA in response to "[v]oluminous consumer complaints about abuses of telephone technology"). In light of its concern over telemarketers' use of random and sequential number generators, Congress sought to restrict the use of particular "telecommunications equipment." H.R. Rep. No. 102-317, at 5 (1991). The Act accomplished this by sharply curbing the use of what it called an "automated telephone dialing system" or ATDS.

An ATDS is not just any computerized telephone; instead, the TCPA defines an ATDS as equipment that can "store or produce telephone numbers to be called, using a random or sequential number generator . . . and . . . dial such numbers." 47 U.S.C. § 227 (a)(1). *See also ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018).

In its 2015 ruling, the FCC reaffirmed that "the basic functions of an autodialer are to '*dial* numbers *without human intervention*' *and* to 'dial thousands of numbers in a short period of time.'" *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling and Order, 30 FCC Rcd. 7961, 7974, ¶ 17 (rel. Jul. 10, 2015) ("*TCPA Declaratory Ruling*") (emphasis added) (citations omitted).

Further, the TCPA only covers "equipment that has the specified capacity to generate numbers and dial them *without human intervention*." 27 FCC Rcd. 15391, 15392, n. 5 (2012) (emphasis added). And case law confirms that where a communication application's subscribers cannot initiate messages except through their own human

intervention, the application platforms are not ATDS as a matter of law. *See, e.g. ACA Int'l v. FCC*, 885 F.3d 687, 703 (D.C. Cir. 2018) ("[T]he 'basic function' of an autodialer is the ability to 'dial numbers without human intervention.' 2015 Declaratory Ruling, 30 FCC Rcd. at 7973 ¶ 14; *id.* at 7975 ¶ 17. Prior orders have said the same. 2003 Order, 18 FCC Rcd. at 14092 ¶ 132; 2008 Declaratory Ruling, 23 FCC Rcd. at 566 ¶ 13. That makes sense given that 'auto' in autodialer—or, equivalently, 'automatic' in 'automatic telephone dialing system,' 47 U.S.C. § 227(a)(1)—would seem to envision non-manual dialing of telephone numbers.")

Without facts or evidence, Plaintiff baldly alleges the system sent "thousands of text messages" containing the same content, using equipment "capable of making numerous calls or texts simultaneously (all without human intervention)." Complaint at ¶¶ 23-24.[4] Other than pure speculation, Plaintiff provides no support for these assertions.[5] *Id.* at ¶ 24.

FFC engaged an independent contractor, Opn Sesame, LLC, for this project. As discussed at length and repeatedly with Plaintiff's counsel through conferences and filings related to a now-closed matter in the Southern District of Florida, Opn Sesame, LLC does not utilize an ATDS, but rather utilizes a peer-to-peer texting program. A list of phone numbers is manually uploaded into Opn Sesame's program, by a human programmer. The content of text messages is input into this program, again by a human programmer. A team of "Senders," human individuals who operate the program, then must manually click a button to send each text message. Accordingly, every text message sent from Opn Sesame's

---

[4] Plaintiff's confusingly claims these text messages relating to a voter guide somehow constitute a telephone solicitation or advertisement, which is defined as "encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." Id. at ¶ 25.

[5] Indeed, such statements are directly contrary to information provided by FFC's counsel to Plaintiff's counsel in another matter, now closed, in the Southern District of Florida. During a phone call on November 2, 2018, FFC's independent contractor Opn Sesame, LLC described in considerable detail that its system required a human operator to send each message, and lacked any technical capability to automatically send such messages.

system required at least one click by a human in order to be sent. It is not possible for Opn Sesame's peer-to-peer texting program to automatically initiate text messages to multiple numbers without human intervention. Because human intervention is required to initiate text messages, the use of Opn Sesame's system cannot be a violation of the TCPA. In an effort to come to an amicable conclusion in similar litigation, FFC's counsel and Opn Sesame's programmers discussed this fact at great length with Plaintiff's counsel. Plaintiff's counsel's decision to file this similar, flawed case against similar Defendants appears to be wasting this Court's precious time and resources.

### B.   Plaintiff's Complaint Fails To State A Claim Because It Does Not Allege Any Plausible Set Of Facts That Would Show FFC's Communications Sent A Prerecorded Voice.

Plaintiff's complaint also asks this Court to engage in interpretive gymnastics and conclude the **text** messages transmitted a **prerecorded *voice*** in violation of the TCPA. Complaint at ¶¶ 22-23. The TCPA prohibits making any call (other than certain exclusions) using "any automatic telephone dialing system <u>or</u> an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b). Merriam-Webster's Dictionary defines "voice" as a "sound produced by vertebrates by means of lungs, larynx, or syrinx, *especially* sound so produced by human beings." Notwithstanding the nonsensical result that written words in a text message constitute a prerecorded ***voice***, a district court in the Ninth Circuit has already summarily dismissed this precise argument. In *Glauser v. GroupMe, Inc.*, 2015 U.S. Dist. LEXIS 14001 at *19-20 (N.D. Cal., Feb. 4, 2015), the court dismissed plaintiff's complaint, holding that it presented no triable issue of fact and that plaintiff presented "no authority for the argument that a text message can have a 'voice' — artificial, prerecorded, or otherwise." *Id.* at *20. This Court should follow the precedent of its fellow Ninth Circuit district court, as well as the basic definitions of words in the English language, and similarly find that a text message cannot be a "prerecorded voice."

### C.  The Statute Plaintiff's Claim Relies On, The TCPA, Is Facially Unconstitutional

If this Court concludes, as a matter of first impression, that the TCPA nevertheless can reach the speech at issue here, it should hold the TCPA violates the First Amendment as a content-based restriction of speech that cannot survive strict scrutiny. U.S. Const. Amend I. A restriction of speech is "content-based" on its face when it draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As the Supreme Court recently reiterated, content-based restrictions of speech are "presumptively unconstitutional," *id.* at 2226 and subject to "the most exacting standard of review," *id.* at 2237 (Kagan, J., concurring), no matter "the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech," *id.* at 2228 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

#### i.  The Overbreadth Doctrine Generally

The Supreme Court of the United States has provided the Overbreadth Doctrine—under which an entire statute may be invalidated due to a First Amendment defect in only one portion of the statute—to ensure that constitutionally protected speech is not chilled. To invalidate a statute as a whole under the Overbreadth Doctrine, a litigant must show the statute "[p]unishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003). Stated differently, a court will invalidate an entire statute under the Overbreadth Doctrine if the litigant establishes that, although the statute may be constitutionally applied in some circumstances, the statute is so broad that there is "a realistic danger that the statute itself will significantly compromise recognized *First Amendment* protections." *N.Y. State Club Ass'n Inc. v. City of New York*, 487 U.S. 1, 14 (1988).

In bringing a challenge under the Overbreadth Doctrine, a litigant need not argue the statute is unconstitutional as applied to the litigant directly, but may instead rely on

unconstitutional applications of the statute to third parties that are not before the court.[6] *See id.* at 11 ("[T]o prevail on a facial attack the plaintiff must demonstrate that the challenged law . . . even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties." (internal quotation marks omitted)). A movant brings an Overbreadth Doctrine challenge to a statute that prohibits speech not simply for the benefit of the movant, but primarily "[f]or the benefit of society—to prevent the statute from chilling the *First Amendment* rights of other parties not before the court." *Sec'y of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958 (1984)). To protect the constitutional right to freedom of speech, the expansive remedy of complete invalidation of the statute is provided out of a concern that the "[t]hreat of an enforcement of an overbroad law may deter or chill constitutionally protected speech." *Hicks*, 539 U.S. at 119. Withholding constitutionally protected speech from the marketplace of ideas injures all citizens. *Id*.

Because the TCPA is substantially overbroad and significantly infringes on the First Amendment rights of FFC and others not presently before this Court, as discussed below, the TCPA as a whole is invalid under the Overbreadth Doctrine.

      **ii.** ***Citizens United* And *Reed* Altered The Analysis For Whether Strict Scrutiny Applies To Statutes That Ration Speech**

The *Citizens United* Court's foundational premise was that the First Amendment prohibits statutes that ration speech based on the identity of the speaker. *See Citizens United,* 558 U.S. at 350; *see also id*. at 394 (Stevens, J., dissenting) ("The basic premise underlying the Court's ruling is its iteration, and constant reiteration, of the proposition that the First Amendment bars regulatory distinctions based on a speaker's identity."). This premise is not new. *See, e.g., First Nat'l Bank v. Bellotti*, 435 U.S. 765, 777 (1978) ("The inherent worth of the speech in terms of its capacity for informing the public does not

---

[6] As noted above, this Motion raises a facial challenge to the TCPA. If necessary, Defendants FFC and Reed will file an as-applied challenge after the parties have taken discovery and developed evidence of the facts underlying the effects of the TCPA on their right to speak freely on matters of public concern.

depend upon the identity of its source, whether corporation, association, union, or individual."). *See also* Michael Kagan, *Speaker Discrimination: The Next Frontier of Free Speech*, 42 Fla. St. U. L. Rev. 765, 766 (2015).

Similarly, in *Reed*, the Supreme Court stated the crucial first step in analyzing whether a statute offends the First Amendment is determining whether a statute is facially content-based. If it is, regardless of motive or justification, strict scrutiny applies. *See Reed*, 135 S. Ct. at 2228.

In *Citizens United v. FEC*, the Supreme Court reviewed a federal statute that—in the context of federal elections—banned corporations and unions from speaking. 558 U.S. at 318-19. However, individuals were not similarly limited in their express advocacy speech. *See Buckley v. Valeo*, 424 U.S. 1, 51 (1976). In *Citizens United*, the Supreme Court declared the statute imposing a ban created an unconstitutional distinction based on the identity of the speaker—corporations and unions—from making independent expenditures and electioneering communications.

Because "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution[,]" laws that restrict speech must be subject to strict scrutiny. *Id*. at 14; *see also Citizens United*, 558 U.S. at 340. The need for strict scrutiny review is further supported because the First Amendment is "[p]remised on mistrust of governmental power," especially the government's use of the legislative power to "disfavor certain subjects or viewpoints." *See Citizens United*, 558 U.S. at 340. The Supreme Court declared that the First Amendment prohibits statutes that create distinctions based on the identity of the speaker, allowing speech by some speakers but not others. *See id*.; *see also id.* at 341 ("The First Amendment protects speech and speaker, and the ideas that flow from each.").

Rationing speech based on the identity of the speaker is interrelated with the government's ability to ration speech based on the speech's content. *See id*. A statute, therefore, violates the First Amendment when the statute identifies certain preferred

speakers, allowing these preferred speakers to speak but prohibiting others. *See id*. at 341. This injures both the speaker, who is trying to persuade the listener, and society, which is deprived of the speech and the ability to evaluate the merits of that speech because that evaluation has been arrogated by the state. *See id*. Therefore, particularly in the context of political speech, the First Amendment does not permit statutes that impose restrictions based on the identity of the speaker. *See id*.

        iii.    ***Reed* Altered The Analysis For Determining Whether A Statute Discriminates On The Basis Of Content**

Five years after *Citizens United*, the Court in *Reed* declared unconstitutional a statute that made distinctions based on the content of the speaker's speech. The Town of Gilbert prohibited the placing of signs within town limits without a permit. *Reed*, 135 S. Ct. at 2224. The Town of Gilbert's Sign Code applied differently to Ideological Signs, Political Signs, and Temporary Directional Signs Relating to a Qualifying Event and exempted twenty-three different forms of signs. *See id*. Importantly, the Town of Gilbert still permitted people to speak through signs, but, unlike the TCPA's automated call ban, different rules applied to the sign depending upon the content of the speech.

The Court stated the first step in determining whether a statute is content-based, thereby triggering strict scrutiny, is not whether the purpose of the statute was disagreement over any message conveyed, but rather, the first step is "[w]hether the law is content neutral on its face." *Id*. at 2228. The Court stated the commonsense meaning of content-based "requires a court to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys." *Id*. at 2227. Thus, a statute is content-based "[i]f a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. at 2227. As the Supreme Court stated prior to *Reed*, a statute is "content based if it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014).

The Town of Gilbert contended the statute was content-neutral because it did not "censor or favor particular viewpoints or ideas" and the political or ideological signs "are neutral as to particular ideas or viewpoints within those categories." *See* 135 S. Ct. at 2229. The Court rejected this argument, noting a statute that targets specific subject matter is still content-based regardless of whether the statute has a benign justification or does not discriminate based upon viewpoint. *See id*. at 2229-30. The central point of *Reed*, therefore, is that the first step of the analysis must determine whether the statute at issue, on its face, discriminates based upon the message or topic that the speaker conveys. *See id*. at 2227.

The Court concluded the Town of Gilbert's Sign Code was facially content-based because the Sign Code's exemptions created distinctions based upon the message the speech conveyed. *See id*. The town created different rules for signs that communicated directions to a church event or other "qualifying event." These rules were different from signs that communicated a message designed to influence an election. The Town of Gilbert's rules were different for those signs that communicated speech concerning non-commercial or ideological ideas. *See id*. The Supreme Court provided the following example: that the Sign Code would treat a sign that communicates directions to a meeting to discuss the philosophy of John Locke differently from a sign endorsing the philosophy of John Locke. *See id.* Thus, the Supreme Court concluded, "[t]he restrictions in the Sign Code that apply to any given sign thus depend entirely on the communicative content of the sign." *Id*.

Under *Citizens United* and *Reed*, the Supreme Court has ruled the First Amendment prohibits statutes that create different rules based upon the identity of the speaker and the content of that speaker's speech. The TCPA applies different rules depending on both the identity of the speaker and the content of the speech. This is in direct contravention to the First Amendment as further explained in *Citizens United* and *Reed*.

. . .

. . .

### iv. The TCPA Rations Speech First On The Basis Of The Speaker's Identity And Then On The Basis Of Content

The TCPA's automated call ban—on its face—rations speech according to both the identity of the speaker as well as the content of the speech. Under *Reed* and *Citizens United*, therefore, the TCPA's automated call ban must be subject to strict scrutiny.

The TCPA is plainly content-based because it is riddled with exceptions that allow the government to pick and choose what speech is desirable and what speech is not—the hallmarks of a content-based restriction of speech. *See, e.g.*, *McCullen*, 134 S. Ct. at 2531 (noting that a statute is content-based "if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred" (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). For example, as recently amended, the TCPA exempts from liability a call "made solely to collect a debt owed to or guaranteed by the United States." Bipartisan Budget Act of 2015 § 301(a), Pub. L. No. 114-74, 129 Stat. 584; *see* 47 U.S.C. § 227(b)(1)(A)(iii). It is difficult to imagine a more blatant example of the government choosing speech that it clearly favors for naked financial reasons (debt collection calls about government-issued or government-backed debt) over speech that it does not (any other debt collection call). And the statute empowers the FCC to exempt calls made to a wireless number with an ATDS if the calls "are not charged to the called party" and are "in the interest of the privacy rights this section [was] intended to prevent." *Id.* § 227(b)(2)(C); *see also id.* § 227(b)(2)(B)(ii)(I) (similar for artificial or prerecorded voice calls to residential telephone lines). The FCC has applied this malleable "privacy" exception to calls about such mundane matters like medical appointment reminders. *See* 2015 Order, 30 FCC Rcd. at 8030. Each of these exceptions requires a court to "'examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen*, 134 S. Ct. at 2531 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)); *see also Reed*, 135 S. Ct. at 2227 (holding a speech restriction is "content-based" on its face when it "draws distinctions

based on the message a speaker conveys"); *Norton v. City of Springfield*, 806 F.3d 411, 412 (7th Cir. 2015) ("*Reed* effectively abolishes any distinction between content regulation and subject-matter regulation. Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification.").

Because it is content-based, the TCPA is subject to strict scrutiny. The "purpose of the [strict scrutiny] test is not to consider whether the challenged restriction has some effect in achieving Congress' goal. . . . The purpose of the test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to ensure that legitimate speech is not chilled or punished." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004). "A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005). Even if the government's interest in promoting privacy is a compelling one, the TCPA, with its vague exceptions, still fails strict scrutiny because it is underinclusive and less restrictive alternatives means of regulation are available to further any government interest.

The TCPA's expansive exceptions render it underinclusive. While Plaintiff complains about an unwanted, and allegedly automated, notification from FFC, the speech the TCPA exempts is no different. Texts about medical appointments or prescriptions may be at least as intrusive as texts about issues of relevance to voters in an election. And, texts about government debt are no less invasive than texts about the positions of candidates for federal and state office. The (increasing) patchwork of exceptions that pocks the TCPA causes it to fail the tailoring prong of strict scrutiny. As was the case in *Reed*, the government "cannot claim that placing strict limits on [some calls] is necessary to [promote privacy] while at the same time allowing unlimited numbers of other types of [calls] that

create the same problem." 135 S. Ct. at 2231. A "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Republican Party v. White,* 536 U.S. 765, 780 (2002).

As the Fourth Circuit recognized in *Cahaly v. Larosa*, there are numerous less restrictive alternatives for "protect[ing] residential privacy and tranquility from unwanted and intrusive robocalls," 796 F.3d 399, 405 (4th Cir. 2015), which are the governmental interests at stake with the TCPA. These "less restrictive alternatives include time-of-day limitations, mandatory disclosure of the caller's identity, or do-not-call lists." *Id.* Each of these would advance Congress's interest in promoting privacy without requiring the government to sift through speech to determine its worth and value. Banning some calls and exempting others "may seem like a perfectly rational way to regulate [calls], but a clear and firm rule governing content neutrality is an essential means of protecting the freedom of speech, even if laws that might seem 'entirely reasonable' will sometimes be 'struck down because of their content-based nature.'" *Reed*, 135 S. Ct. at 2231 (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994) (O'Connor, J., concurring)).

### V.  CONCLUSION

For all of the aforementioned reasons Defendants respectfully request that this Court grant their motion to dismiss under Rule 12(b)(6), with prejudice, award attorney's fees to Defendants and grant such other and further relief as the Court deems just.

RESPECTFULLY submitted this 8th day of February, 2019.

                        **BERGIN, FRAKES, SMALLEY & OBERHOLTZER, PLLC**

                        By: */s/ Brian M. Bergin*
                        Brian M. Bergin
                        4343 E. Camelback Road, Suite 210
                        Phoenix, Arizona 85018
                        *Attorneys for Faith and Freedom Coalition, Inc., and Ralph Reed*

|  |  |
|---|---|
| 1 |  |
| 2 | **HOLTZMAN VOGEL JOSEFIAK** |
| 3 | **TORCHINSKY PLLC** |
| 4 | By: /s/ Steve Roberts Esq. |
| 5 | Jason Torchinsky |
|   | Steve Roberts |
| 6 | Holtzman Vogel Josefiak Torchinsksy |
| 7 | 45 North Hill Drive, #100 |
|   | Warrenton, Virginia 20186 |
| 8 | *Pro Hac Vice Counsel for Defendants* |
| 9 | *FFC & Reed* |

### CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF Registrants:

| | |
|---|---|
| Frank S. Heden<br>Hedin Hall LLP<br>1395 Brickell Avenue #900<br>Miami, FL 33131<br>fheden@hedinhall.com<br>*Counsel for Plaintiff* | Manuel Hiraldo<br>Hiraldo PA<br>401 E. Los Olas Blvd #1400<br>Ft. Lauderdale, FL 33301<br>*Counsel for Plaintiff* |
| Ignacio J. Hiraldo<br>JH Law<br>1200 Brickell Avenue #1950<br>Miami, FL 33131<br>ijhiraldo@ijhlaw.com<br>*Counsel for Plaintiff* | Michael Eisenband<br>Eisenband Law PA<br>515 E. Las Olas Blvd #120<br>Ft. Lauderdale, FL 33301<br>*Counsel for Plaintiff*<br><br>Jason Torchinsky<br>Steve Roberts<br>Holtzman Vogel Josefiak Torchinsksy<br>45 North Hill Drive, #100<br>Warrenton, Virginia 20186<br>*Co-Counsel for Defendants FFC & Reed* |

By: */s/ Kristine Berry*